v. BP Expl & Prodn Good morning, Your Honor. Kevin McGlone on behalf of the Plaintiff Appellant Clayton Faerber and his son. Your Honor, Mr. Faerber's son died, who is a minor child, died in December 2017 from T cell acute lymphoblastic leukemia. The allegation is that the leukemia was caused by exposure to the oil residue and dispersant chemicals that washed ashore on the beach on the Mississippi Gulf Coast. It's not in dispute that in the latter part of 2020, the months, there were several studies that started to come out that for the first time were talking about oil exposure to children, the effects of the children, particularly on beaches on the coast, and also the effects of dermal contact, skin contact, with the oil or these chemicals. Just explain to me how the child got exposed to the chemicals. Were they going out to the beach? They were going out to the beach. Every day? I don't know how often, Your Honor. I don't know the frequency and the duration of the that gets entered by the district court. It sets a deadline of April 16, 2021 for the plaintiff to provide expert reports. The plaintiff goes out and he hires an expert. He gets an expert in February. He gets Dr. Sanu, who is going to testify, going to look at these reports, and is going to provide the requisite causation. You know, he was exposed to these The problem is it takes time to develop these opinions in this case. You know, this is a toxic tort case, and you have underlying studies that are just being issued in the months preceding this expert report deadline. This is not a case, this is not a, you know, a traditional slip and fall case where you go, have an orthopedic surgeon who's going to say, yes, the plaintiff needed knee surgery, yes, the knee surgery was related to the accident, and, you know, you are an economist who's going to say what the lost wages are, et cetera. This is a very niche area talking about certain, you know, very complicated and very complex issues of toxicology and science and how these chemicals interact. And, you know, in this case, the plaintiff, his counsel got ahead of the game, and he asked before the expert deadline, he asked the district court for more time, as he had done in other cases involving other exposure cases, with response workers who were out working on the oil spill response for more time to submit an expert report. And I think it's important that we talk about the timing here, and the timing is important. One of the cases that BP has relied on is this Court's decision in Geisserman. And in that Geisserman case, the plaintiff didn't submit the expert report timely. He didn't even ask for more time. He waited until the deadline lapsed, he didn't submit the report, he tried to submit the report late. In fact, he was given two chances by the district court to submit expert reports, and he failed at both of them. And then he comes up with a host of excuses why he couldn't file the report clearly. And it's not because I can't get the expert reports. I mean, at one point, he says, as this Court's opinion said, said, well, somebody in my office just wrote the wrong date on the calendar. And . . . Well, counsel, there are certain distinctions that can be made. It seems to me fundamentally here the issue that discretion is measured against is you brought this lawsuit, understandably, before the science was there. And you still can't say at this point in the litigation that there's a causal relation between what BP did and the terrible tragedy of this child. So at some point, it's almost an argument that the Court needs to just defer until the science develops, however long that lasts. And I don't think that's the law. So where is the proper place in an abuse of discretion standard to draw the line and say we can't wait any longer for this science? Well, Your Honor, the science developing, and that's these reports that were coming out in 2020 that the expert could rely on. And it's also notable that other district courts, including the district court where this case came from, the Southern District of Mississippi, the Eastern District of Louisiana, recognized the developing nature of the science here and granted motions to extend deadlines. There were five, I believe, five decisions of the Southern District of Mississippi. They're cited in our brief on page 25, where the district courts in those cases recognized that because the science on the oil spill and the exposure to the spill was developing, some additional time would be allowed to allow the plaintiff to prepare an expert report. And other district courts in this circuit, and I believe some of the district courts in Alabama as well, and they're cited on page 28 of our brief, granted extensions of time, recognized exactly what Your Honor is saying. It says, understandably, you need to have it cut off, and understandably, there needs to be some point where you just can't indefinitely push it out. But at least in this case, you had an expert who was prepared to, who needed, who simply said, I need time to prepare a proper expert report. It wasn't, the request for relief wasn't, please give me an, just hold the case wide open, let me go see if I can find an expert, and I'll get back to you in six months. They didn't do that here. He had the expert lined up. The expert presented an affidavit and said, I explained he needed more, the expert needed more time to prepare the report for this case. It was not a, it was not some wide open, just let us, let us get back to you when we think we have a claim. That's, that's the point I'm driving at, Your Honor. And, you know, it's also, I think, important to note that the district court here, when it granted the dismissal, I'm sorry, when it denied review of the magistrate judge's decision, and even the magistrate judge, they rely on the Reeves case, the decision that had been in front of the same magistrate judge, the same district court beforehand, and they basically both heavily rely on Reeves. In fact, if you look at the order denying the motion to, to, by the magistrate judge, it's in the record at page 516, the court simply says, it's a three paragraph, four paragraph decision where it cites solely to Reeves and says for the same reasons there, I'm going to deny the motion to extend. And notably, Reeves, in that case, what the magistrate judge said and what the district court judge, what the district court ultimately found, and the magistrate, the district judge's decision is, it was attached to pleadings in this case, it's in the, it's in this record at page 482, I'm sorry, starts at page 482 of the record, said the plaintiff was diligent. The plaintiff was diligent in trying to find expert, an expert. They don't, they didn't knock him out for waiting too long or not getting the expert timely or all these issues. They, what got held up was the issue of the importance of the study and whether you needed the study or not. But in terms of the factors that the court said, the court was very clear in Reeves, and it gets adopted in this case by the, by the district court, was the plaintiff was diligent. The plaintiff made efforts, has done what he had to do, and has, you know, come before this court and has made an effort, just needs more time. Well, I don't understand. Weren't some, weren't a couple of these reports done by Dr. Perlin, who's your expert? One of the, Dr. Perlin was going to use the reports, Your Honor, the invisible oil study to issue a report in the Reeves case, some of the other cases, and her research would have ultimately been the foundation for Dr. Sanu's report here to tie in . . . I thought Dr. Perlin was one of your experts. That's correct, Your Honor. All right. And she had completed certain reports back in 2020. That's correct. She had prepared certain reports that she was, that she would then use as the foundation for the reports. Well, when you say foundation, did you explain to the court exactly what she was going to have to do and how long it would take? Yes, Your Honor, and certainly it was, you know, it was explained to the court that the study she had done in, in the published study that she had done was going to have to be used to do, it was not an expert report. Let me, the study that she had worked on was not an expert report for litigation. It was an epidemiological, I think I'm saying that word right, study that was published in the literature and that, that would be used as, as to help prepare specific causation reports for the, for the various cases that were then pending. But clarify this for me. It's not just applying to the specific facts of this child. Isn't it true that what she had done so far wasn't focusing on the dispersants and the oil itself on beaches and so she would have to, I don't know what would be involved, but she had not studied that yet? That's correct, Your Honor, and that, you're, you're right. She had not studied that specific issue. She was going to have to use the research she had done to, to, to link it to the beaches and, and, and to, you know, more, more specific . . . I mean, that's my concern. I mean, you have a very sympathetic case, very sympathetic family. But what Judge Girola, and after Judge Meyers had his attention brought to the issue of how he should look at this, Judge Meyers, Magistrate Meyers as well, were, were concerned, tell me if it's right, were they looking at a situation where there wasn't yet developed by any expert, as you explained to them, what the causation would be and how it would be proven and, or how it would be assessed in some sort of expert report? That work still needed to be done to see if there even was a correlation. Correct. They were going to need to prepare the report. The report had not . . . Not just prepare the report, but you weren't yet able to tell Judge Girola or Judge Meyers that there was an expert you had that would say, yes, this was the cause, that the work still had to be done to determine if this was the cause of this poor child's death? That's correct, Your Honor. They were going to have to ultimately make that link, and they were confident they could do that, but that was the same issue that had been at play in other cases where these extensions were granted. The point being that the sort of inquiry as to whether the expert reports could pass muster under Article . . . I'm sorry, I've spent too much time in state court. Federal Rule of Evidence 702 and the Daubert Standard was something that should be developed on a proper evidentiary record under those rules, but you didn't have a report here, and that's what . . . Well, I'm sorry to interrupt, but why did you ever agree to a scheduling order in December? I don't . . . Honestly, Your Honor, I wasn't in the . . . we weren't in counsel. I'm not sure why Mr. Downs agreed to the scheduling order in December. That was . . . I don't know the facts and the circumstances of that scheduling order, but . . . Can you give me something of the bigger picture? Maybe your friend on the other side would be better for this. This is . . . is this just one of hundreds of BELO claims with the same general need for expert testimony for the same kinds of injury? This is different because it involves a child and it's . . . instead of somebody who was actually a response worker. A lot of the other cases are generally dealing with people who were involved in the actual cleanup of the oil spill and were exposed to chemicals. Your lengthy page 28 footnote of all these examples, what are those? Is that what you're describing? That's correct, Your Honor. Those are those cases. This is the only one that involves this circumstance with the child, but the issue, I think, that was recognized there is equally important in this instance, and especially Judge Fallon over in the Eastern District of Louisiana recognized in the Cervera-Vargas case that's cited in our briefs, that an issue on the scheduling order and trying to decide something under a scheduling order is not the proper time to decide the admissibility of expert testimony and the reliability of the testimony. Let's have a record and then we can look at it. We can make a decision whether or not there's sufficient facts and evidence to warrant the case going forward under the expert testimony. Again, it was found to be diligent and certainly the court recognized there the importance of the information. At the end of the day, we just think as a matter of fairness, these plaintiffs should all be treated on an equal footing. If they're being given the opportunity in some cases to provide expert reports and in some cases not, you have an issue of just the equities there. Okay, you have time for rebuttal. Thank you, Your Honor. Thank you. Mr. Hicks. Thank you, Your Honor. And may it please the court, George Hicks for the BP appellees. This court has repeatedly held that a district court has, quote, broad discretion to enforce its scheduling order and that this court, quote, will not lightly disturb a district court's enforcement of a scheduling order's deadlines. Here, the district court did not err, much less abuse its broad discretion when it enforced its scheduling order by declining Farber's last minute request to extend the deadline for designating his experts. Remind me, was it a general extension? Did he have a time certain he was asking for an extension or just give me more time? He asked for 90 more days, six more months? Your Honor, the motion that was filed the day before the deadline, I believe, asked for four additional months, so doubling the time that he had already been given in the December scheduling order. And notably, the last page of that motion or the memorandum supporting that motion gave BP one additional month to respond with its own experts, which we think just underscores some of the prejudice that would have been borne by BP here. But I think it's important to note that, as I think my friend's presentation today displayed with some of the questions, Farber has offered tellingly shifting rationales for extending the deadline, and it's never been entirely clear why that deadline needed to be extended or for which experts, whether it was Dr. Perlin or Dr. Sahu. If you look at the original motion, it's almost entirely focused on Dr. Perlin. Dr. Sahu is not even mentioned in the body of the text. I think he's mentioned in two footnotes. So that was all about Dr. Perlin, of course, whose study and article came out February 2020, well before Farber even filed, Farber's counsel filed that lawsuit in June 2020. But in any event, then when there was objections to the magistrate judge's decision, there was a shift and there were explicit disclaimers that this has nothing to do with Dr. Perlin. It's all about Dr. Sahu. They're at record 789, 792, 798. Plaintiff does not request an extension to develop Dr. Perlin's report. But then back before this Court, if you look at the statement of issues, it's all about Dr. Perlin. And plaintiff argues that he needed time to designate Dr. Perlin and have her develop the report. But then the rest of the brief goes back and talks about Dr. Sahu. So it's candidly never been entirely clear to us what the reason for that extension. Was Perlin, Dr. Sahu, the treating doctor, do you know? He was not a treating doctor. I'm fairly sure of that. I think he was just an expert. And to be very clear, I think I heard my friend refer to him as a causation expert. That's not true. Dr. Sahu, like Dr. Perlin, was being brought in as an expert on exposure and duration. And at page 2 of Farber's reply brief, they note, so these are not causation experts. And on page 2 of his reply brief, he says, well, we were eventually going to get one had we gotten that extension. But I don't think you can sort of say after the fact, oh, we also would have needed a causation expert. I mean, that is supposed to be done before the deadline, and that was not even brought up to the District Court, again, even on the eve of the request. And Farber had ample time to develop his expert evidence before the deadline, whatever that expert evidence might have been. Again, the Perlin study article came out in February 2020, well before his suit was even filed. The Beeches study, which was the basis for some of these later articles, that's from 2018. And the articles themselves, I mean, one is from June 2020, another is from September 2020, and the last is from December 2020. Those are all either predating the agreed-upon scheduling order for the expert deadline. I think the last article may have come a couple days after it. So there's certainly not diligence when, given all that, Farber waits until the day before the scheduling order's deadline to ask for an extension. Certainly, I think it would be, Judge Southwick, you used the word discretion. And I think that's certainly significant here in that this Court has repeatedly recognized that District Courts have broad discretion to enforce their scheduling orders. And particularly in a case like this, where this judge had seen strikingly similar motions to extend the expert deadline from this same plaintiff's firm, and this same plaintiff's firm had been on notice, that those motions had started to be denied. And the reason is because maybe a motion that you need more time to develop something might have made a little more sense immediately after the Perlin study comes out, or immediately after the Beeches study comes out. But as you get further and further away from those studies, they're not newly published research anymore. And so I think that it's entirely within the District Court's discretion to recognize that, to recognize that the same firm is bringing the same motions, essentially boilerplate, and just simply asking for more time without really even specifying what they need that time for. Let me ask you what your argument maybe has already been, or what it would be. The Reeves case, I'm looking at, I guess this is Girola's order, this was a BILO lawsuit against BP claiming he was exposed to oil and chemical dispersants by a Birmingham shoreline, and boom decontamination work. Your friend on the other side says this is one of the few, if not only child, playing on the beach cases. Are your experts, is the science developed enough that what that child was doing would be different than, and exposure would be different than what is going on in all these other cases? It looks like Reeves is one of the more standard cases of workers dispersing the oil slick as opposed to a child. But is it BP's position that the science is different? Well, Your Honor, I think BP's position is consistent across the cases, which is in all of these BILO cases, the plaintiff has to, has the burden of establishing exposure and causation and, you know, and it's undisputed that... I thought I'd try, I thought I'd try to see what your answer was. That's okay. Well, I think that, you know, I think that, you know, it's consistent across the cases as to, regardless of what the claimed condition might be or what the claimed science might be, and, you know, nothing, nothing about the science here was particularly new on April 15th, the day before the scheduling order deadline. How many BILO cases are there now? I, it changes weekly, but I think it's still in the hundreds, but, you know, that they... You know, I wrote an opinion about that eight or nine months ago, probably, and it was in the hundreds at that point. Yes, and I think it's, I think it's lower than that, so, you know, but I think that also goes towards the fact that these scheduling orders are designed to keep these cases moving and in fairness to everyone, including BP, but including all other plaintiffs, and that that is why, you know, when a court is faced with a request to change its scheduling order, whether it's before or after the fact, it has the broad discretion to do so. And I heard my friend talk about the fact that, that this was a timely request. Now, it was one day before the deadline, and this court has held in other cases that one day before is still insufficient, and even two weeks before is insufficient, and those are in cases, that's the Borden case and the Puig case, those are in cases where it was a pro se plaintiff, not even a experienced plaintiff's firm that was well on notice that these motions were starting to get denied. But I think the more fundamental point is that, at least for the first factor, the question is not timeliness, it's diligence. What have you been doing all that time? I mean, in this particular case, Plaintiff's counsel knew as early as 2012 when the settlement agreement with the BELO mechanism was established. Well, the child didn't die until 2017. I understand, Your Honor, but even as early as 2018, when there was a notice of intent to sue and the filing of the lawsuit in June 2020, that Plaintiff's counsel would need to develop the requisite expert evidence. Had the Plaintiff's counsel, you know, generically speaking, on the Gulf Coast retained Dr. Perlin to do these, examine these studies? I believe that Dr. Perlin had been retained in many of these. But I mean, had they, you know, funded her research or gotten an expert to look into these possibilities? I'm just wondering. I don't know if anything in the record speaks to that, Your Honor. I don't know whether they're funding her article or anything along those lines, but, you know, it certainly came out well before even when this lawsuit was filed. My friend refers several times to the fact that other courts have granted extensions in similar situations, but number one, many of those cases, in fact, many of them are simply not similar because, first of all, those motions came earlier in many times even before the scheduling order came out or around that time. Second, this is a situation where, again, we think Plaintiff's counsel wants to designate two different experts. Perlin and Sahur wants the extension for that. So it's already introducing more prejudice to BP in having to respond to not one but two experts with self-described new science and that's, you know, and being only given a short time to respond to that. And then number three, all of those cases, for the most part, came before these district courts started denying extensions, particularly as brought by Plaintiff's law firm and in this particular court, Southern District of Mississippi. But I think the broader point is simply that another court might happen to grant an extension of its scheduling order does not mean that it's an abuse of discretion for another district court not to do that. I mean, that's the entire point of the abuse of discretion standard that this court has consistently recognized in Squires, Batiste, Geiserman, Barrett. Just as it would not be an abuse of discretion for a court to modify its scheduling order under the circumstances presented to it, it would not be an abuse of discretion for the district court here to retain its scheduling order under these circumstances. In fact, Farber doesn't cite a single case and BP is not aware of a single case where this court has reversed a district court's decision declining to modify its scheduling order. And we don't think that the circumstances here warrant this being the first time that a court has determined that a district court has abused— I sat on a case like that. Where the district court— It was a long time ago. I don't—I didn't bother to look it up before now. I was just— Sometimes the mind runs long. Well, then this would not be literally unprecedented if you did it here. But you also sat on Geiserman and wrote that— I wrote Geiserman. You wrote that opinion and we think that— That's a long time ago. And we think that Geiserman is very significant and has been reaffirmed multiple times by this court in underscoring the district court's broad discretion to preserve the integrity and purpose of the pretrial order. Just to speak to a couple other points that my friend across the aisle made. He pointed out, I believe, that the district court and the magistrate court in this case seem to say or imply that actually there was diligence by plaintiff's counsel here. A couple responses to that. First of all, this is not an argument that is actually pressed really by Farber in his briefs. He just mentions it in passing on pages 16 and 19 of his brief. Doesn't really develop it, so we think it's forfeited. But for good reason, because I don't think the district court actually said that. If you look at what Farber characterizes, he says the district court recognized that the magistrate judge, upon relying upon Reeves v. BP, impliedly found that the first factor in the good cause analysis was satisfied. And I think the word impliedly does a lot of work there, because if you go back and look at those decisions, I don't think that that's what the district court was actually doing. And in fact, if you go back and look at the Reeves decision, which is, according to Farber, sort of the foundation of all this, that was a decision where the district court was applying clear error review to a decision by the magistrate court to extend the deadline. And the district court said, well, there's not clear error in the finding of diligence, but there are these other factors that I'm going to find is reversible. So that was on a different standard of clear error review, whereas in this particular case, you don't have that. The magistrate judge denied the extension, and the district court affirmed that. And if anything, I think if you're going to kind of go down that path of sort of trying to unpack the Reeves decision and how it relates to all this, although we don't think you have to or should, I would think that that actually implicates a sort of double deference, because then you're talking about, well, it's an abuse of looking to see whether the district court abused its discretion in not finding clear error of the magistrate court's decision. And we're not aware of a case where at least the court has ever had to confront that. The Second Circuit has done that. We note that in a footnote in our brief, and they essentially say it's a double deference at that point. So I don't think that really helps Farber out much. We don't think you have to go there. You can simply apply the broad abuse of discretion standard you already have. But I think also, if you were to go down the road of giving some sort of deference to this idea that the district court here impliedly found the first factor satisfied, I don't know why you wouldn't do the same for all the other factors that the district court looked at in its overall conclusion and give discretion to that and simply affirm, again, based on the broad abuse of discretion standard. And if there are no further questions, I would ask that judgment be affirmed. OK. Thank you very much. May I proceed, Your Honor? Yes, sir. Mr. Just for the tape, Mr. McGlone. Thank you, Your Honor. The issue comes back to, yes, these reports were issued in the specific studies on the exposure to children, the dermal exposure. June, September, December 2020. And it is difficult in a case, I think, and the evidence bore that out and the other courts have recognized that it's difficult in a few months to put together a credible expert report on an issue like this. How many cases were filed on behalf of child injuries? I'm sorry, how many? How many cases have been filed about child injuries? I'm not aware of the number of cases. I know that this is, I think, the one or the first one that the Downs Law Group, the firm who's handling the case in the trial court, is prosecuting. Okay. There may be others, Your Honor, but I just, I'm not aware of that. But I think it's important to note that this is a unique set of facts with the child and that you have science and you're working to develop it and you have the experts are saying they can provide it. The question was asked about Dr. Perlin and my understanding is Dr. Perlin was not retained and was not identified by the Downs Law Group as a potential expert until after her report, until after her study came out. To my knowledge, and I'm speaking solely from my knowledge, Your Honor, but my understanding of having done some of these appeals in this case, she was not known, she was not funded by the other plaintiff's lawyers. She was not a retained expert. She had not been retained until after the study came out. The way, as I understand it, Your Honor, she didn't even come on their radar screen until the study came out and they recognized the benefits of what her report could provide. If I said that Dr. Sunu and Dr. Perlin were going to be causation experts, I may have just misspoken. I was not trying to suggest to the court that their role would have been any greater. They were going to, say, talk about the effects of these chemicals. Obviously, you would need experts who were going to talk about the specific link to the child, so I apologize if I misspoke on that point. We do think this is a case of an abuse of discretion under these facts. We think that there was diligence, there's been a move to retain experts and develop the report. It's clearly important here, the facts I don't think could be any more important. If they don't have this expert report, the claim is dismissed. There's no doubt about that. You need the expert report to be able to survive a summary judgment. We believe that the factors under Rule 16 were satisfied. We believe there was an abuse of discretion, particularly wherein you have a number of cases that have recognized that you allow these reports to go forward. The point of the reference, the deference to Reeves' finding of diligence, I think it's proper. You can say, look, the order here by Judge Breyer clearly says we're adopting what we did in Reeves, and Reeves says clearly, to start with, we find there was diligence. Where we disagree with Reeves is the efforts to engage in this preemptive inquiry into the merits of the expert report without even seeing the expert report or seeing the foundation of the expert report and being able to test the expert report to see whether it meets must or under Rule 702. We think that there was an abuse of discretion to rely on a decision that in this preemptive Daubert inquiry. I'm looking at your, just for future reference, your record excerpt. Is the order denying continuance or the magistrate judge order in here or the ... No, Your Honor, I noticed that. I noticed that last night. Just for the court's benefit, I have it here. It's page 516 in the record, and I thought it was in there, but I apologize that that wasn't included. All right. Thank you, Your Honor. All right. Thank you very much. We have your argument, and the court will stand in recess.